## THE R. J. MORAN. CORNELL STEAMBOAT CO. v. P. SANFORD ROSS, Inc., et al. Petition of CAHILL TOWING LINE, Inc.

(Circuit Court of Appeals, Second Circuit. April 28, 1924.)

Nos. 303–304.

1. **Collision** ⬅➡58—**Tug in fault for permitting tow to swing from her course.**

It is the duty of a tug with a tandem tow to keep it straight behind her under normal conditions, and a meeting vessel is not in fault for acting on the assumption that she is able to and will do so.

2. **Collision** ⬅➡57—**Starboard hand rule held not to apply.**

The starboard hand rule *held* not to apply, where one of two vessels with her tow, after rounding an island, straightened on her course, and both understood that they were to pass on meeting courses.

3. **Shipping** ⬅➡215—**Duty to mark sunken wreck rests solely on the owner.**

The statutory duty to mark the wreck of a sunken vessel rests only on the owner of the sunken craft.

4. **Navigable waters** ⬅➡24—**Tug held not in fault for failing to stand by and mark wreck of tow.**

A tug having two barges in tow, one of which was sunk in collision, *held* not in fault for failing to stand by and guard the wreck until it was marked, and not liable for injury to another vessel by collision with the wreck within 15 minutes after it sunk, despite warning signals from another tug.

Appeals from the District Court of the United States for the Southern District of New York.

Libel filed by the Cornell Steamboat Company against P. Sanford Ross, Inc., and the steam tug R. J. Moran, her engines, etc. Under the fifty-third rule in admiralty, P. Sanford Ross, Inc., petitioned in the steam tugs G. H. Dalzell, Holbrook, W. S. Holbrook, and A. S. Sherman, and Fred B. Dalzell & Co., Inc., Holbrook Towing Line Inc., W. S. Holbrook, and the steamship Isanti. The Cahill Towing Line, Inc., owner of the steam tug R. J. Moran petitioned for limitation of liability, which was granted. A decree was granted against the R. J. Moran. The damages to be paid were divided one-half to P.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Sanford Ross, Inc., and the other to the Cornell Steamboat Company. The Cornell Steamboat Company appeals. Modified and affirmed.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Robert S. Erskine and Henry P. Elliott, both of New York City, of counsel), for appellant.

Everett, Clarke & Benedict, of New York City (A. Leo Everett, of New York City, of counsel), for P. Sanford Ross, Inc.

Foley & Martin, of New York City (Geo. V. A. McCloskey, and William J. Martin, both of New York City, of counsel), for Cahill Towing Line, Inc.

Burlingham, Veeder, Masten & Fearey, of New York City (Chauncey I. Clark, of New York City, of counsel), for Fred B. Dalzell & Co., Inc., and Steamtug G. H. Dalzell.

Bigham, Englar & Jones, of New York City (L. J. Matteson, of New York City, of counsel), for W. S. Holbrook and Holbrook Towing Line, Inc.

William Hayward, U. S. Atty., of New York City (R. B. Romaine, Sp. Asst. U. S. Atty., of New York City, of counsel), for S. S. Isanti and the United States.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

MANTON, Circuit Judge. One decree, as entered in the court below, granted a limitation of liability to the Cahill Towing Line, Inc., as owner of the steam tug R. J. Moran on its petition, and fixed its value at $5,500. The appellant, as owner of the steam tug J. C. Hartt, and P. Sanford Ross, Inc., as owner of the scow 9–S, have each been allowed a recovery of one-half of this sum. In the other decree, the libel against P. Sanford Ross, Inc., and the petitioned-in appellees was dismissed.

On May 2, 1919, the Moran left Shadyside, N. J., with two loaded mud scows in tow on a hawser tandem, and proceeded down the North River bound for Pier 40, Brooklyn. The hawser between the tug and the first scow was 90 feet long, and there were 3 feet between it and the second scow, the 9–S. It is estimated that the tow was about 400 feet long. The steamship Isanti, without steam, was proceeding from Pier 66, E. R., to the Bay Ridge anchorage, in tow of the tugs Holbrook and Sherman, assisted by the tugs W. S. Holbrook and G. S. Dalzell. The master of the Holbrook was on the steamer's bridge in charge. There was a hawser between the W. S. Holbrook from the steamer's port bow, one from the Sherman to the starboard bow, one from the Holbrook made fast to the port quarter, one from the Dalzell to the starboard quarter. The weather was clear, the wind southwest and the tide the last of the ebb. The towing of the Isanti, which was owned by the United States government, was performed by the Holbrook Towing Line; it agreeing to furnish tugs to shift the steamer to her anchorage. The Holbrook Towing Line employed the Dalzell, which was engaged through the Fred B. Dalzell & Co., Inc., its agents. The other three tugs were operated by the Holbrook Towing Line. On the bridge with the master of the Holbrook was the steam-

er's master, her third officer, and quarter master. As the Isanti and her tugs were proceeding down Buttermilk Channel at 4:30 p. m., the Moran was observed with her tow, proceeding down on the westerly side of Governor's Island. When below the southerly end of the island, the Moran swung to port under a starboard helm heading in an easterly direction toward the upper end of Pier 38, Brooklyn. Thus the Moran was on a course to pass the Isanti starboard to starboard. The Moran continued. The strong ebb tide in the North River swung her tow around to the east. The captain in charge ordered the tugs ahead to haul to port, the Dalzell full speed ahead with her helm to starboard and the Holbrook full speed astern in order to swing the Isanti clear, but the collision was not avoided, and the second scow, the 9–S, in tow of the Moran sagged across the Isanti's stem, causing it to sink in a few minutes. The Dalzell cast off her lines to the steamer and proceeded to the rescue of the captain of the sinking scow. The Isanti continued on until clear of the wreck and then anchored for a short time. The Moran continued to her destination—Pier 40, Brooklyn—with her remaining scow in tow, and telephoned to the owners of the tug and advised them of the sinking. About 15 minutes after the sinking, the tug J. C. Hartt, owned by the appellant, approached the place where the scow sank, and, although the Dalzell blew several warning whistles, the Hartt continued and fetched up hard and fast on the wreck. She was later floated and towed away. At the time the Hartt struck the sunken scow, there was no buoy placed upon the wreck. An alarm whistle was blown by the Moran as well as the Dalzell.

[1] We are satisfied from the proofs that the Moran's tow was in the ebb water of the North River, which caused the tow to swing down across the Isanti's bow, and that the Moran was not powerful enough to keep her tow under control and straight behind her. While it was not improper for the Moran to round the lower end of Governor's Island or to attempt to pass the Isanti starboard to starboard, still, in doing so, she should have been equal to the task of properly handling her hawser tow. While the swinging of the tow was caused by the tide and wind, or perhaps by the tug's change of helm, her tow did swing to starboard and against the Isanti's bow, and for this she must be held responsible. The obligation to keep her tow straight behind her has been constantly enforced. The Wrestler, 232 Fed. 448, 146 C. C. A. 442; The Aurora, 258 Fed. 439, 169 C. C. A. 455; The Madison, 250 Fed. 850, 163 C. C. A. 164. She might have kept near enough to the island to get the benefit of slack water. It is contended on this appeal that the Isanti's tugs were at fault in their navigation. It is argued that this swing should have been anticipated by those on the Isanti or those in charge of the tugs towing her. But proper navigation required the Moran to hug close to the southerly end of Governor's Island, and this was what was expected of her. The captain of the Moran admitted that he knew this to be the proper course to take. The tugs and those in charge of the Isanti could not be expected to guard against the neglect of the Moran, nor could they be expected to anticipate such a swing of the tow as to make a collision likely.

[2] The appellant's claim is that the Isanti was the burdened vessel under the starboard hand rule. We think this is untenable. Undoubtedly it was intended at all times to pass starboard to starboard. The captain of the Moran testified that he hauled around the end of the island and laid his course to pass to the Black Buoy on the southeastern corner of the island about 50 feet off, while the Isanti passed about 250 feet north of this buoy. That such a passage was intended is clear from the fact that no signals were blown until it became apparent that the Moran had lost control of her tow and was likely to be carried across the bow of the Isanti. Then danger signals were blown. In determining whether the starboard hand rule applied, the courses, the channels, and the shore line must all be considered. The rule is ordinarily inapplicable to vessels coming around bends or channels which may at times bring one vessel on the starboard of the other. The Victory, 168 U. S. 410, 18 Sup. Ct. 149, 42 L. Ed. 519; The Arrow, 214 Fed. 743, 131 C. C. A. 49.

[3, 4] It was not the duty of the tugs towing the Isanti to mark the wreck of the sunken vessel. That obligation was placed by statute on the owner of the sunken craft. 30 Stat. 1152; Compiled Statutes, § 9920. This court has held that duty is upon the owner and no one else, and that there is no divided responsibility; the reason being that, if the statute is to be effectual, there cannot be. The Anna M. Fahy, 153 Fed. 866, 83 C. C. A. 48; Dougherty v. Lampasas (C. C. A.) 280 Fed. 402; McWilliams Bros., Inc., v. Director Gen. of Railroads (C. C. A.) 271 Fed. 931; The Drill Boat No. 4 (D. C.) 233 Fed. 589; Worth v. Steam Tug William Murtac (D. C.) 6 Fed. 192. Nor do we think that there was liability on the part of the Moran for failing to stand by and mark the wreck. The master of the Moran was active in reporting to his office so that the manager might notify the Lighthouse Department, and, having landed the other scow which he could not neglect, he returned to the wreck. He remained there until a vessel from the Lighthouse Department arrived. We may assume that this vessel from the Lighthouse Department came in response to the Moran's notification. It was while the master of the Moran was at the pier reporting the loss that the Hartt ran upon the wreck. The Moran blew an alarm whistle and could do no more. The Dalzell also blew alarms to the Hartt. If the Moran had remained so as to mark the wreck instead of going to the pier, she could have done no more than the Dalzell did in giving warning to approaching vessels to keep off. We adhere to the principle that the statute requires the owner alone to mark the wreck until the Lighthouse Department undertakes such duty. There is no divided responsibility. The Macy, 170 Fed. 930, 96 C. C. A. 146.

The decree below properly placed the limitation of liability of the Moran at $5,500, but, since it divides the damages between the owners of the Hartt and the scow 9–S, it must be modified so as to award the owner and claimant of the scow 9–S the full sum fixed in the limitation of liability. The decree in Cornell Steamboat Company against P. Sanford Ross, Inc., and others, interpleaded, is affirmed.

Decrees modified and affirmed, without costs.