Frank A. LOWERY, Libellant,

v.

THE Tug ELLEN S. BOUCHARD, THE Motor Tug ELLEN S. BOUCHARD, Inc. and Bouchard Transportation Company, Inc., Claimant-Respondents, and four other cases.

Civ. Nos. 5006, 5017, 5185, 5251, 5256.

United States District Court, N. D. New York.
Jan. 31, 1955.

Joseph J. Mailloux, Albany, N. Y., and Foley & Martin, New York City, for libellant and respondent-claimant, Frank A. Lowery, Christopher E. Heckman and Edward J. Ryan, New York City, of counsel.

James F. Dalton, Albany, N. Y., and Krisel, Beck & Taylor, New York City, for claimant-respondents & cross-libellants, Tug Ellen S. Bouchard, Motor Tug Ellen S. Bouchard, Inc. and Bouchard Transportation Co. Inc., Maurice A. Krisel, Max Taylor, Roman Beck, New York City, of counsel.

George J. Hatt, 2d, Albany, N. Y., and Mahar & Mason, New York City, for libellant, Kehoe Bros. Transportation Co., Inc., Frank C. Mason, New York City, of counsel.

Atkins, Weymar & Randell, New York City, and Joseph J. Mailloux, Albany, N. Y., for libellant, Cargill, Inc. and impleaded respondent, Inland Survey Bureau, Inc., Horace T. Atkins, New York City, of counsel.

FOLEY, District Judge.

This array of admiralty suits arises from a collision in the Hudson River at a point adjacent to the south end of the City of Albany. Four of the suits involve the original collision and the sinking of two barges and damage to others; the fifth suit is based upon the aftermath of such collision resulting in the running upon one of the sunken barges by the tug, Clayton P. Kehoe. The cases were tried together by the court. Although it is not an easy task, I shall endeavor to discuss them together.

Complexity entered the trial, and now the disposition of the issues, because of the unusual position and theory of defenses, impleader and cross libels advanced by the Bouchard interests at the trial and in their briefs. Also, the ordinary divergence and contradiction in the testimony which seem to be the pattern in collision cases, whether on the highways or waters, is present to an extreme degree. Some of the unseemly conflict in eye-witness versions as to distances is treated in accord with the philosophical comment in The Detroiter, 2 Cir., 82 F.2d 234, 235: "The thing happened at night when estimates of distance, proverbially unreliable at any time, are especially illusory." Despite such difficulties, it is clear that the dominant issue for decision throughout is the responsibility for the first collision. Such issue marks the main course and the extent of the voyage into novel and uncertain channels shall depend greatly upon the disposition of this problem. This determination, as always, must be based upon the facts developed on the trial by testimony, depositions and exhibits, as I find they preponderate to one side or the other, and the definite law applicable, if such exists, to the particular factual situations involved.

To give some sense to the discussion and to limit the confusion engendered at least in my mind by the presence of an impleaded respondent, the Inland Survey Bureau, Inc., in the Cargill libel, and the voluminous cross libels by the Bouchard interests back against the libellants, Frank A. Lowery and Cargill, Inc., it may be well to summarize generally certain facts and events together with the circumstances surrounding the collision. Such recital should clarify to some extent the basis for the involved procedures and contentions that enter the picture.

The Lowery flotilla, ordinarily made up as at the time of the collision, sailed the waters of the Hudson River and Barge Canal for a considerable number of years. It was old in the service of carrying cargo, well known to the trade and canal and river people, and on many

occasions it carried scrap iron west from New York City to Buffalo, and grain east from the terminal at Buffalo to the City of Albany. The "steamer", Motor/Vessel Frank A. Lowery, was a converted wooden barge itself, carried cargo and pulled its tow of wooden barges tandem-style behind by hawsers keeping the tow close up, each bow to stern. It was an established custom and practice over the years for the protection of the charterers and the insurance underwriters of cargo, to inspect all the vessels of the Lowery flotilla at the beginning of each trip and after the discharge of cargo at the destination. Many of these detailed reports, described as on-hire and off-hire inspection reports, and particularly those made in reference to the carriage of scrap iron, are introduced by Bouchard to disclose such extraordinary weakness, infirmity, old age and disrepair as to warrant the inference and conclusion that such conditions caused, or contributed to the cause of the collision on September 25, 1953, in the river at Albany, or at least contributed to the sinking of the two barges and damage to the other barges and cargo.

Specifically, Inland Survey Bureau, Inc. is on the scene as an impleaded respondent, brought in by Bouchard in the Cargill libel, because in early September it inspected the Lowery flotilla for its client, certain insurance writers, for the carriage of Cargill grain from Buffalo to its grain elevator in the Port of Albany. At first Inland disapproved the vessels as unfit for the carriage of grain, but after repairs were made by Lowery himself and crew to the inner lining of the barges, the vessels were approved, the grain was loaded and the Lowery fleet came through the canal and down the river to the place of its misfortune.

The Lowery flotilla on the early morning of September 25, 1953, cleared the Dunn Memorial Bridge at Albany with six wooden barges in tow. The fifth barge was the Mae Lowery. The sixth barge was the Marion O'Neill. The

river and channel at or near this point has substantial expanse, and the Dunn Memorial Bridge under which the tow passed is a main artery for automobile and truck traffic from the Albany side of the river to the Rensselaer or east side of the river. The destination of the flotilla, the Cargill grain elevators at the Port of Albany, is but a short distance beyond the bridge on the west bank of the Hudson River. Proceeding downriver behind the Lowery fleet came the tug Ellen S. Bouchard, pushing in tow the steel barge B–90. Its destination was an oil dock on the east side of the river on the Rensselaer side, in the near vicinity of the collision. At a point 800 to 1,100 feet beyond the Dunn Bridge, the Bouchard tow struck the stern of the barge Marion O'Neill, which sank almost immediately. The time was 2:20 a. m. Eastern Daylight Time. Within a range of ten to fifteen minutes, despite some effort on the part of her captain to pump her, the Mae Lowery also sank. At about 4:00 a. m. the tug Clayton P. Kehoe came down the river from a dock in the City of Albany and ran upon the wreck of the Mae Lowery.

From this background came the five suits. First, Frank A. Lowery, the owner of the Lowery flotilla, sues the tug Bouchard and the Bouchard interests for the loss of the two barges, Marion O'Neill and Mae Lowery, and damage to other barges, as a result of the collision. Second, Cargill, Inc. sues both the Lowery and Bouchard interests for the loss of the grain carried in the sunken barges with an indefinite claim for damage to grain carried in the surviving barges. It is in this action that Bouchard impleads Inland Survey Bureau, Inc., on the alleged ground that Inland is liable to Cargill, Inc. (which did not sue Inland) for negligent inspection of the Lowery fleet and its approval of the fleet for transport when allegedly it was not fit and able to transport safely. It is their contentions that Inland acted as the agent for Cargill in making the inspection, that Cargill

should be charged with the knowledge of the agent that the Lowery was unable to control her tow, and finally, for these reasons, Cargill, Inc. may be charged with fault for the collision. In its brief, Bouchard is gracious enough to state: "It is of little moment to Bouchard, under the circumstances, whether Cargill collects from Inland or not." The third suit is termed a protective cross libel by the Bouchard interests against the Lowery interests for indemnity and contribution in the event of any recovery by Cargill, Inc. against Bouchard. There is no claim of damage for the barge B-90 or the tug Ellen S. Bouchard. Then, to balance out things evenly, and possibly square away the entire situation, the fourth suit is another protective cross libel by Bouchard against Cargill, Inc. for indemnity and contribution in the event of recovery by Lowery against Bouchard. The fifth suit is a simple, understandable one by the owner of the tug Kehoe against the tugs Bouchard and Lowery, and Lowery personally, for the damage the tug sustained.

### The Collision Issue.*

This issue is clearly the crucial one. I have little difficulty, from a review of the evidence, to place the responsibility for the collision upon the tug Ellen S. Bouchard. Despite the conflicting testimony, the credible evidence establishes to my judgment that the situation was plainly and simply an overtaking one with a complete lack of due care and caution in the navigation and maneuvering of the tug Bouchard and the push tow, Barge B-90.

The excellent photographs in evidence (Bouchard Exhibits 22a–h, Lowery Exhibits 6, 7a–b, 8a–b) show that the place of the accident was at a substantial span of river and channel with an almost straight contour within the river banks. The size and apparent strength of the B-90 is shown in photographic Lowery Exhibits 10, 11 and

12, and the tidiness and outward maintenance of tug Lowery is shown in Lowery Exhibit 18. The night was described as a fine, clear, moonlit night by Kjolner, the mate of the Bouchard, with the admission by him that no wind or current affected the navigation of the Bouchard tow previous to the collision. (A–13). The Lowery tow was first sighted when the Lowery tow was clearing the Dunn Bridge and the Bouchard tow clearing the second railroad bridge, a distance of 2,500 to 2,600 feet (196). There was no other traffic in the river either southbound or northbound to interfere with a normal and cautious overtaking at the time of the collision or to distract attention from the Lowery flotilla ahead in the river. The Bouchard tow with its speed had complete control of the decision as to the closing and overtaking a tow which the mate knew was slow and had tendency to yaw. There was plenty of time and distance upon the approach to slow to a minimum speed, and even reverse, until he was sure of the speed, location and maneuvers of the Lowery fleet.

The "crossing under the stern" explanation does not impress me. The fancy language and interpretation of Kjolner to distinguish the situation from an overtaking is not plausible. (184, 202–4; 225). His attempts to grasp at straws cast doubt upon his testimony. As, for example, a current, eddy or ebbtide may have caused the Lowery to swing (235–6), and the fear of a yacht in the vicinity. (268). If one accepted his testimony from the deposition read at the trial: "You forget, Sir, I am going from west to east. I am leaving him. I have gone by." (204); "I am going on the east bank from the west bank * * * going across and not north and south." (206), it would be difficult to comprehend that an actual collision occurred.

After much tugging and hauling, some admission as to the real situation of an overtaking comes from the state-

---

* References are to the record.

ment of Kjolner that as they were proceeding previous to collision he probably would have reached his destination of the Gulf Oil Dock in Rensselaer before the Lowery tow came abreast of it, (208–10), and at last the guarded statement that it was his intention to get further downstream than the Lowery was (211). I accept his statement, although doubtful, that the two-whistle signal was sounded because I feel it gives further support to its meaning as an overtaking signal, as he testified at the Coast Guard hearing (229).

As to the abrupt sheer by the Lowery tow across the entire navigable channel, there is nothing in the record but conjecture, speculation and assumption upon which to base such a finding. The most significant and silent answer to this contention is the location of the sunken Marion O'Neill about 150 feet westward from the east channel line, (46) and about 50 feet east of mid-channel line (60). Even more compelling is the location of the sunken Mae Lowery across the west channel line, the side upon which the Lowery fleet was proceeding downstream when first sighted by the Bouchard. As Cone said, who was on the scene first, the Marion O'Neill went down fast (522–525). The blow, although forceful, was an overriding one which went over the stern of the Marion O'Neill, and it is clear the Marion O'Neill sank immediately and did not move far from the point of contact. The force of the impact is supported by the diver inspection of the Marion O'Neill (78–81), and the derrick operator who baled out the wheat from the Marion. (316–321). Much of the evidence convinces me that the Lowery tow was in good line at or near mid-channel at the time of the collision. It would tax credulity to believe that the tail of the tow swung just prior to the collision to block the entire navigable channel.

The collision, in my judgment, was a combination of error, mistake, confusion, faulty navigation and maneuver, and lack of reasonable care, alertness, foresight and judgment on the part of the mate and deckhand of the Bouchard that solely, proximately and efficiently caused the collision, the sinkings and the damage. The emergency was not created by the Lowery. The situation was an overtaking one and inasmuch as it is undisputed there was no exchange of signals, and no consent was obtained from Lowery for passage, the law is settled that the burden was on the Bouchard to slow down, keep astern and such distance as to avoid collision. The Industry, 2 Cir., 29 F.2d 29; The Holly Park, 2 Cir., 39 F.2d 572.

With this conclusion, to discuss all the contentions advanced by Bouchard to place the fault for the collision on the Lowery fleet would be quite pointless, and would make this opinion much more aimless than probably it is now. The failure of a stern lookout by Lowery, the failure to blow the danger signal by Lowery, the failure of steering wheels on all the barges, the alleged inherent weakness of the barges, and other contentions, fall by the wayside, because I do not find that they contributed to the happening of the accident. The testimony of the experts as to the possibilities and probabilities, as to what might have been or could have been, is not of sound, probative value, because it is my conclusion from direct evidence and inference therefrom that the tow did not sheer, and the sole cause of the sinking of the two barges was the force of the impact. "The collision is sufficient to account for it all." The City of Macon, 2 Cir., 121 F. 686, 690.

Much of the testimony of the Bouchard experts, and I acknowledge them as eminent men in their field, is conjectured, and even approaches the mystical and spiritual. It is probably good guessing but not good proof; it comes from inference based upon inference, presumption based upon presumption. United States v. Ross, 92 U.S. 281, 23 L.Ed. 707; Looney v. Metropolitan R. Co., 200 U.S. 480–483, 26 S.Ct. 303, 50 L.Ed. 564. Statements that the Mae Lowery might not have sunk if it were a good, sound, strong, rigid boat does not have

much meaning when the facts show that the last barge directly behind it was struck with such force that the entire tow surged forward alongside the Lowery motor vessel. There is no evidence present to show something was not done to save the Mae Lowery in the short period of time before she settled. It may also be that the Lowery barges were nearing the end of their economic life, but it seems safe to say that if the collision had not occurred they surely would have made the landing at the Cargill elevators and discharged their cargo before they were forced to graceful retirement.

■ The half damage principle in the law applied to old and infirm boats is applied to situations where the boats do not have the fair and ordinary strength to resist slight or ordinary contact. Much of the law cited by Bouchard is good, sound law but it does not fit the facts here, and is clearly distinguishable.

### The Cargill libel and Bouchard cross-libels.

■ The previous discussion settles the issues in the Cargill libel and the impleading petition therein against Inland Survey Bureau, Inc. Under the charter arrangement for the carriage of grain (Cargill Exhibit 2) Lowery shall not be responsible for damage arising from collision unless caused by its negligence. I have found Bouchard solely responsible, and Lowery not at fault, and Cargill, Inc. is entitled to a decree in full, under my reasoning, solely against the interests of Bouchard.

Despite the speculation again that the Lowery fleet was old, unseaworthy, unfit for the voyage and a menace and nuisance to navigation, the best evidence is that it had transported over the years and was transporting at this time cargoes of grain, and on other occasions had carried scrap iron. In my judgment it was sufficiently fit and seaworthy for the assigned voyage to Albany. No inspection reports, unless divine, could prophesize the collision below the Dunn Bridge, and I have concluded that such collision was the sole, proximate cause of the sinking and damage, and was caused by the carelessness of the Bouchard.

There is no evidence that Inland Survey Bureau, Inc. acted as agent for Cargill in its inspection for the carriage of grain on this occasion. In fact, the contrary is shown. The privity existed between the underwriters and Inland. The reports, involving scrap iron carriage, were to estimate possible damage claims. When grain was carried as here, the purpose of the inspection was to ascertain the lining of the vessel for the safe transport of the commodity. It was an established, ordinary, good business practice before the risk was taken to insure a cargo. Apparent inconsistency is present, because in one breath Bouchard says the reports are good, detailed reports that show unseaworthiness, and in the next they were not a careful inspection and survey. There is not the slightest intimation of fraud on the part of the Inland Survey Bureau, Inc. in the protection of the substantial interests of its clients. By no stretch of the imagination can I apply the doctrine, even with extension, of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A. 1916F, 696, and Ultramares Corporation v. Touche, 255 N.Y. 170, 174 N.E. 441, 74 A.L.R. 1139, to this situation.

The Bouchard cross libels seem to me to be in the nature of an offensive defense, and the issues raised thereby and the contentions advanced to support them have been answered.

### The Kehoe Libel.

The issues here are substantial, and under the peculiar facts present an interesting and close problem in law. The true factual situation is not too difficult to penetrate because the preponderance of the credible evidence convinces me that neither the Bouchard nor the Lowery gave any warning to the Kehoe by alarm signal or searchlight as she came down the river and fouled the sunken Mae Lowery. The impressive testimony for this conclusion is first that of McCormick, the mate of the Kehoe, steering

the tug downriver. He testified he heard no alarm or saw no searchlight in the channel or adjacent waters to warn him of the wreck in the channel (346, 348). The Mae Lowery was submerged at the time, and I find no fault in the Kehoe in proceeding under the circumstances at 10 miles per hour, a lawful speed for the channel. The time was 4:00 a. m. and it was still dark when it ran upon the Mae Lowery. Secondly, I accept the statements of Cone, the deckhand, that at the time the Kehoe hit the Mae Lowery wreck the Bouchard and Lowery tugs were lying alongside a dock several hundred feet from the Mae Lowery; he was fixing his lines and talking to the men on the Lowery; the Bouchard searchlight was out of order; the Bouchard did not blow any alarm; the Lowery did not blow an alarm or use its light. (564, 565, 569, 570). The other versions of warning by alarms and lights from various locations are too contradictory to accept. The Cone description is plausible because the excitement of the events still prevailed in the night air, and to the great credit of them all as good people, it was natural to talk over the unfortunate collision, and particularly the fate of the old barge captain, who went down with his ship, and whom they were most anxious to find. However, it kept their attention from the traffic in the river channel.

■ The Kehoe libel is directed against the tugs Lowery and Bouchard in rem under the general theory of negligence for lack of due care by reason of the failure of both to stand by and warn the river traffic. The second action in the libel is against Frank A. Lowery, in personam for an alleged violation of the Wreck Statute, 33 U.S.C.A. § 409, for failure to mark the wreck of the Mae Lowery, as owner, in accordance with the provisions of that law.

In cogent and persuasive briefs, the Proctors for Kehoe contend the Wreck Statute should not be the sole measure for the responsibility of the collision and damage to the Kehoe. The distinction is made that because of the presence of the two tugs in close proximity to the sunken Mae Lowery there was a duty and obligation upon both of them and their crews *to stand by and warn,* which was separate and apart from the duty imposed by statute upon the owner Lowery *to mark* the wreck as prescribed. (Emphasis mine). It is not too debatable that if some warning had been given by either tug the second collision might have been averted.

A strong and consistent line of authority has placed the duty to mark upon the owner of the sunken wreck alone. The Anna M. Fahy, 2 Cir., 153 F. 866; The R. J. Moran, 2 Cir., 299 F. 500, 502; Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77; Berwind-White Coal Mining Co. v. Pitney, 2 Cir., 187 F.2d 665. The general principle of statutory responsibility is maintained throughout the decisions.

In the Moran case, citing the Fahy case, it is reiterated [299 F. 503]: "This court has held that duty is upon the owner and no one else, and that there is no divided responsibility; the reason being that, if the statute is to be effectual, there cannot be." Again, in Red Star, 18 F.2d at page 79, citing the above two cases: "It must be remembered that the tugs do not share in the duty to mark the wreck, whatever their fault for causing it." In the more recent Berwind-White case, 187 F.2d at page 669: "It is a matter of public policy reflected in the statute to place the responsibility for marking the wreck squarely upon the owner alone."

As Kehoe maintains, there is intimation in several of the cases that certain conditions may arise to impose the duty upon the tug at fault instead of the owner. However, the extreme in such conditions is shown by the example in The Anna M. Fahy, supra, 153 F. at page 868: "where all representatives of the owner are drowned or where communication with him is impossible from any cause". The question of the liability of the railroad was not decided in the Berwind-White case, and the reasoning was

parallel to the possible responsibility of a wharfinger to a business invitee coming into a pier. See Cornell Steamboat Co. v. Robert Gladstone, Jr., Inc., D.C., 8 F.Supp. 431.

In my judgment, there is not enough present here for me to qualify the flat principle of responsibility set by higher authority. The master of the tug Lowery was on the scene at all times. If he had performed the statutory duty to mark, which he must have known,—and I think standing by and warning would be substantial and probably better performance of the statutory obligation under the circumstances,—the accident might have been averted and his owner relieved of the responsibility commanded by law. Despite the situation which is extraordinary in the vessels lying side by side where each could warn, I think liability must be confined to and determined under the Wreck Statute.

However, if I am in error, I would hold the Lowery responsibile under the general doctrine of negligence and not the Bouchard. Under the facts as I have found them, the master was aboard and in charge of the Lowery for some time previous to collision by the Kehoe on the wreck. He had nothing to do but try to mark or warn, and he did neither. His searchlight was working and that of the Bouchard was not. His main interest throughout was in the surviving barges of his tow. He knew much better than the Bouchard people where the Mae Lowery lay because he was alongside when it settled and ordered the lines cut from it as it sank. Captain Weber of the Bouchard was not aboard for some time before the Kehoe came down and he gave his mate and deckhand instructions to warn. The Bouchard spent more than an hour looking for the drowned captain and was at the wreck of the Marion O'Neill during that time, which was 1,400 or 1,500 feet above the Mae Lowery. A capable volunteer, Weber tried to contact the Coast Guard and Engineer to mark the wreck even though the responsibility was not his.

■ The decision of responsibility under the Wreck Statute is troublesome for me. In reference to the marking, the term "immediately" has been construed to mean within a reasonable time, The Anna M. Fahy, supra, and in some conditions failure to mark within two hours may be unreasonable. Petition of Anthony O'Boyle, Inc., 2 Cir., 161 F.2d 966. The approximate time from the sinking of the Mae Lowery and the fouling by the Kehoe would be about ninety minutes. It is possible that Mr. Lowery had his telephone notice from Tucker at least a half hour before 4:00 a.m. The period of time, if actual notice is necessary to the owner, would be a short period and might be considered unreasonable. However, his master had immediate, personal knowledge, stayed in the vicinity and did not mark or even attempt to mark. The practicality of the situation should be considered. The most owner Lowery could have done to meet the statute would be to tell Tucker to go down and tell the captain to mark the wreck, which Lowery says he did, when the captain was already there and assumed to know the obligation as a master in charge. Olsen, the master of the Lowery, knew the location of the wreck much better than Mr. Lowery or the Coast Guard at that critical time. Notice to the Coast Guard would not have relieved Mr. Lowery from his liability to make all reasonable efforts to mark, Berwind-White Coal Mining Co. v. Pitney, supra, 187 F.2d at page 669, and the evidence does not show effective abandonment by 4:00 a.m.

■ It is not clear in the law that the knowledge of the master may be imputed to the owner under the Wreck Statute, but under the facts here it should. There is good comparison in Berwind-White, supra, 187 F.2d at page 669, where the personal knowledge of a general foreman was charged to a corporation. See Eastern S. S. Corp. v. Great Lakes Dredge & Dock Co., 1 Cir., 256 F. 497; The Drill Boat No. 4, D.C., 233 F. 589. I hold that Frank A. Lowery, in personam, is responsible to the libellant, Kehoe, for violation to mark under the particular circumstances present, because of the knowledge and fault of his master

in charge in not marking the wreck Mae Lowery within a reasonable time.

To summarize the decisions in the five suits:

The libellant, Frank A. Lowery, may have a decree against the tug Ellen S. Bouchard. Libellant Cargill, Inc. may have a decree in full against the Bouchard interests, the libel against Lowery is dismissed, and in this libel the impleading petition of Bouchard against Inland Survey Bureau, Inc. is dismissed. The cross libels of Bouchard against the Lowery interests and Cargill, Inc. are dismissed. The owner of the tug Clayton P. Kehoe may have a decree under the second cause of action in its libel against Frank A. Lowery, personally. The first cause of action in this libel against the tug Bouchard and the tug Lowery is dismissed. If necessary, the decree shall be settled on five days' notice.

I have considered all the evidence and exhibits. I shall file herewith separate findings of fact and conclusions of law in each suit. The exhibits received in evidence shall be returned to the respective attorneys by whom introduced.