**READING COMPANY, a corporation, as Owner of Carfloat No. 23, Libellant and Cross-Respondent,**

v.

**POPE & TALBOT, INC., a corporation, as Owner Pro Hac Vice of Steamship THE WALTHAM VICTORY, Respondent and Cross-Libellant,**

v.

**MERRITT–CHAPMAN & SCOTT CORPORATION, Impleaded Respondent and Cross-Respondent.**

No. 471 of 1957.

United States District Court
E. D. Pennsylvania.

March 10, 1961.

Rawle & Henderson, Harrison G. Kildare, Philadelphia, Pa., for Reading Co., libellant and cross-respondent.

Krusen, Evans & Shaw, Albert R. Beal, Philadelphia, Pa., and Kirlin, Campbell & Keating, Elmer C. Maddy, New York City, for Pope & Talbot, Inc., respondent and cross-libellant.

Clark, Ladner, Fortenbaugh & Young, James F. Young, Philadelphia, Pa., for Merritt-Chapman & Scott Corp., impleaded respondent and cross-respondent.

KRAFT, District Judge.

The claims here involved arose from a collision on February 4, 1957, about 1:16 A.M. between the S. S. Waltham Victory and libellant's wrecked and beached carfloat off the southwest end of Petty Island, in the Delaware River, in the Port of Philadelphia.

On December 15, 1959, we ordered that the issues of liability be severed from the issues of damages, and that the liability issues be first tried. The action was so tried, and from the pleadings and the evidence, in which there was little conflict, we make the following

### Findings of Fact

1. At all times material hereto, Reading Company, libellant and cross-respondent, (hereinafter called Reading) owned, operated and controlled Carfloat No. 23, an undocumented, unmanned and unpowered three-track carfloat of steel construction, 250 feet long, 39 feet beam and 9 feet 6 inches deep, which was used for transportation of railway cars in and around the Port of Philadelphia.

2. On January 26, 1957, the carfloat, while under tow in the Delaware River near Port Richmond, fully loaded with 13 full hopper cars of coal and 1 cement car, collided with a vessel not here involved, and was subsequently beached by Reading's tug "Schuylkill" off the lower or southwest end of Petty Island to prevent her from sinking.

3. The bow compartments of the carfloat were flooded as a result of the collision, and she was beached stern to the shore with the bow extending out at right angles from the shore toward the dredged channel.

4. The manager of Reading's Port Richmond Terminal made arrangements with Merritt-Chapman & Scott Corporation, impleaded respondent and cross-respondent, (hereinafter called Merritt-Chapman) for the removal of the hopper cars and salvage of the carfloat. It was agreed that Merritt-Chapman should perform its work entirely on a straight time basis between 8 A.M. and 5 P.M., Mondays through Fridays, without overtime cost to Reading, and would be paid on a daily rate of hire basis. Reading undertook the removal of the coal from the cars.

5. The arrangements between Reading and Merritt-Chapman made no express provision for the lighting or marking of the beached carfloat during the salvage operations.

6. Salvage operations began with the arrival of Merritt-Chapman's derrick barge "Commerce" on Saturday, January 26, 1957. They were conducted each working day thereafter until Friday, February 1, 1957, when they were suspended for the week-end with the intention of resuming operations on Monday morning, February 4, 1957.

7. During the period from Saturday, January 26, 1957, to Friday, February 1, 1957, the derrick barge Commerce remained moored to the starboard side of the carfloat both day and night, except on Wednesday night, January 30, 1957, when she was removed, to return the following morning. Actual operations were carried on only by day, but during each night at the salvage site the Commerce was illuminated and a watchman remained aboard. On the evening of February 1, Merritt-Chapman removed its dredge for the weekend, leaving the beached carfloat without lights.

8. At all times material hereto, Pope & Talbot, Inc., respondent and cross-libellant, was the owner pro hac vice and operator of the S. S. Waltham Victory, a turbine-propelled ship of 7,635

gross tons, 439.1 feet long and 62.1 feet beam.

9. The S. S. Waltham Victory, with a draft of 13 feet forward and 11 feet 8 inches aft, was on a voyage from Providence, Rhode Island, to Pier H, Port Richmond, Philadelphia. The vessel was being navigated by Captain Bamforth, an experienced, qualified and licensed coastal pilot. When the Waltham Victory passed under the Benjamin Franklin Bridge at 12:42 A.M., February 4, 1957, about a mile below the place of its subsequent collision with Reading's sunken carfloat, it was in the middle of the dredged channel. From this point to the place of collision, there were no buoys to mark the edge of the dredged channel.

10. Reading's wrecked, unlighted carfloat was first sighted by Pilot Bamforth and Captain Petterson, bearing slightly on the starboard bow of the Waltham Victory when it was about half a ship length off. The lookout sighted it only at the instant of the collision. In an effort to avoid the partially submerged wreck, the pilot ordered hard left and full ahead to swing the bow clear, but before the orders could be executed the Waltham Victory collided with the offshore end of the submerged carfloat and the railroad cars upon it.

11. The Waltham Victory was then put full astern and came free of the wreck, but the flood tide pushed the vessel to the right toward Petty Island where she rested against the bank until the flood tide gave her enough water to float free.

12. The collision occurred at a point about 175 to 200 yards eastwardly from the easterly edge of the dredged channel and where the water was of sufficient depth for the Waltham Victory to navigate. At the time of the collision, 1:16 A.M., the flood tide had raised the water level approximately 1.7 feet.

13. The master and pilot of the Waltham Victory had intended to remain within the dredged channel, and were unaware of the position of the vessel immediately before the collision.

14. The night was dark but clear. The Waltham Victory had turned off her radar at 1:11 A.M., about five minutes prior to the collision. The vessel's fathometer was not used at any time immediately prior to the collision.

15. No notice to mariners had been issued prior to the time of the collision showing the position of the wreck.

### Discussion

■ The case, in our view, turns upon the interpretation and application of the so-called "Wreck Statute", 33 U.S.C.A. § 409:

"It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in

sections 411–416, 418, and 502 of this title."

We have no doubt that Reading's carfloat was wrecked and sunk in a "navigable channel," within the meaning of the statute. We agree with the reasoning, and the Court's ruling, in Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 1927, 18 F.2d 77, 78:

> "We cannot agree that the phrase 'navigable channel' in section 15 of the act of 1899 * * * confines that duty to those deeper channels marked by buoys and used by large vessels * * *. It would certainly be an unreasonable and capricious result which should limit the wreck owner's duty to marked channels, and exonerate him from responsibility elsewhere, though his craft, as it lay, equally endangered navigation."

■ The Waltham Victory was off her intended course, but we are aware of no rule of law which required her to be navigated within the limits of the dredged channel. As this Court said in American Dredging Co. v. Calmar S. S. Corp., 121 F.Supp. 255, 263, affirmed per curiam, 3 Cir., 218 F.2d 823:

> "That the steamship Calmar was navigating in the extreme easterly part of the ship channel and that its course would and did take it slightly outside of the channel does not, in my opinion, constitute any fault on the part of the vessel. Certainly, it is no fault of which this libellant can complain. I know of no rule of law which limits the navigation of a vessel to a ship channel, as a land vehicle such as an automobile would be limited to operation on a highway. The Oliver [D.C., 22 F. 848], supra; Eastern Transp. Co. v. U. S., D.C., 29 F.2d 588, 590, 591. The vessel may navigate at any part of a river containing navigable water. Eastern Transp. Co. v. U. S., supra. The charts introduced in evidence would indicate that on flood tide there

would be sufficient water for safe passage of a ship of the draft of The Calmar on the course undertaken."

Reading contends that the clause which requires the marking of wrecks sunk in a "navigable channel," when read with the immediately preceding clauses of the statute means "(a) a channel 'actually navigated by steamboats' and (b) a location which will 'obstruct, impede, or endanger navigation.'" We disagree. In the two clauses which deal with the sinking of a vessel or other craft, the reference is to a navigable channel (or channels), without restrictive or qualifying language. The obvious reason is that a vessel sunk anywhere in a navigable channel is a hidden peril, and necessarily constitutes an obstruction and a danger to navigation.

■ We conclude, therefore, that Reading's failure to mark the wrecked carfloat was a violation of the statute, and that, under the evidence, the fault lies solely with Reading. The general rule, and the authorities therefor, are clearly stated in Lowery v. The Ellen S. Bouchard, D.C.N.D.N.Y.1955, 128 F. Supp. 16, 23:

> "A strong and consistent line of authority has placed the duty to mark upon the owner of the sunken wreck alone. The Anna M. Fahy, 2 Cir., 153 F. 866; The R. J. Moran, 2 Cir., 299 F. 500, 502; Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77; Berwind-White Coal Mining Co. v. Pitney, 2 Cir., 187 F.2d 665. The general principle of statutory responsibility is maintained throughout the decisions.
>
> "In the Moran case, citing the Fahy case, it is reiterated (299 F. 503): 'This court has held that duty is upon the owner and no one else, and that there is no divided responsibility; the reason being that, if the statute is to be effectual, there cannot be.' Again in Red Star, 18 F.2d at page 79, citing the

above two cases: 'It must be remembered that the tugs do not share in the duty to mark the wreck whatever their fault for causing it.' In the more recent Berwind-White case, 187 F.2d at page 669: 'It is a matter of public policy reflected in the statute to place the responsibility for marking the wreck squarely upon the owner alone.'"

■ There may be cases where the rule is otherwise, as in the case of a bailment. The Wissahickon, D.C.W.D.N.Y.1915, 226 F. 345. However, the terms of the oral agreement between Reading and Merritt-Chapman, confirmed by letter, afford no basis for a finding of a bailment. It is equally clear, we think, that Reading had no right to assume that Merritt-Chapman would leave its dredge at the scene of the wreck over the weekend merely because it had done so on prior occasions. Reading had a positive, affirmative duty under the statute, and, in light of its agreement with Merritt-Chapman, Reading was not entitled to suppose that Merritt-Chapman would discharge that duty for it.

■ Reading's failure to comply with the provisions of the statute raises a presumption of negligence, "or, as the matter is sometimes put, a failure to do what the act requires is evidence of negligence; but it is no more." Sullivan v. P. Sanford Ross, Inc., 2 Cir., 1920, 263 F. 348, 350, certiorari denied 253 U.S. 492, 40 S.Ct. 586, 64 L.Ed. 1029. In our view, Reading has failed to rebut that presumption.

■ Reading contends that faulty navigation of the Waltham Victory was directly and solely responsible for the collision. Specifically, Reading asserts that the failure to make use of the vessel's radar and fathometer constituted negligence. Captain Bamforth testified that it is not customary to use a fathometer in navigating up the Delaware River, and that he never navigates by radar, since radar is only an aid to navigation. Be that as it may, there was no apparent necessity for making use of either instrument. While some fog had been encountered in the lower reaches of the river, all the evidence indicates that for some time prior to the collision the atmosphere had been clear, though it was a "very dark" night. Lights on ships at anchor were plainly visible. It could scarcely have been foreseen that a half-submerged wreck would be negligently left unmarked where it might endanger navigation. The failure to anticipate negligence which results in an injury is not negligence and will not defeat an action for the injury sustained. A party is not bound to guard against the want of ordinary care on the part of another; he has a right to presume that ordinary care will be used to protect him and his property from injury. No one can complain of want of care in another where care is only rendered necessary by his own wrongful act. McFadden v. Pennzoil Company, 1941, 341 Pa. 433, 19 A.2d 370. We conclude, in the circumstances, that the failure to use radar was not negligence. Afran Transport Co. v. The Bergechief, 2 Cir., 1960, 274 F.2d 469. We reach the same conclusion respecting the omission to use the fathometer.

Reading also urges that the lookout was negligent in failing to sight the carfloat in time to avoid it. From photographs in evidence, it appears that most of the carfloat itself was submerged and that the hopper cars on the outer end were awash. The wreck thus presented to the lookout's vision a small dark object, low in the water and difficult to perceive in the dark against a dark background. Moreover, a persuasive answer to Reading's contention is found in The Wissahickon, D.C.W.D.N.Y.1915, 226 F. 345, 347:

"Libelant next contends that the steamer was at fault for inattentiveness ahead, that if she had had a proper lookout she could have sighted the A-frame, even if unlighted, for it could have been seen a considerable distance, as the night, though dark, was clear; but this view is not justified by the elicited

facts. I am unwilling to indulge in speculation as to whether the vision of some lookouts is clearer than that of others, or whether the night was such that the unlighted frame should have been sighted by a lookout exercising ordinary care. The libelant, as owner of the dredge, was charged with the statutory duty of lighting or marking the place where the Pocantico sank, and navigators fulfill their duty, I think, when they look for lights at night to mark obstructions in the pathway of vessels, and the dredge was in fault for failing to maintain such lights or marks as would have prevented the collision. To charge navigators with the responsibility of sighting unlighted or unmarked wrecks after dark, or to require them to bear in mind the exact location of such obstruction merely because they had been previously notified thereof, would not only be burdensome to them, but would put upon them a greater responsibility than the law requires."

■ Finally, Reading complains that the Waltham Victory negligently failed to post a competent lookout. It argues that the lookout was an ordinary seaman whose eyesight was so defective that he could not obtain an able seaman's ticket, and who admitted that he had to wear glasses on watch. It appears, however, that the lookout was unable to obtain an able seaman's ticket because he is color-blind, a defect in no wise impairing his ability to see objects or lights. We know of no rule that holds a seaman incompetent for lookout duty merely because he wears glasses. The lookout was wearing glasses at the time of the collision, and there is no evidence that his vision, as thus corrected, was defective. While the lookout's testimony was somewhat confused and evasive, we cannot say that he had been inadequately instructed as to what he was to report as lookout, as Reading contends.

If the evidence indicates any negligence in the navigation of the Waltham Victory, it was not negligence of which Reading can complain. The hazard which might render such navigation negligent was the danger of running aground, not the risk of collision with an unlighted wreck negligently left in a navigable channel. The orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty. Cardozo, C. J., in Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253. In any event, we are persuaded that the alleged negligence of the Waltham Victory was not a legal cause of the collision, but only a condition of its occurrence, a circumstance that made it possible. The legal cause of the collision was Reading's negligent non-compliance with the statute.

We regard as pertinent here, the language of the Supreme Court in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84:

"Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor."

Conclusions of Law

1. The Court has jurisdiction of the parties and of the subject matter.

2. Reading's carfloat was wrecked and sunk in a navigable channel within the meaning of the Wreck Act, 33 U.S.C. A. § 409.

3. It was Reading's duty, as owner of the wrecked carfloat, to mark it as required by the provisions of the Wreck Act.

4. Merritt-Chapman was under no legal duty to mark the carfloat.

5. Reading was negligent in failing to mark its wrecked carfloat.

6. Reading's negligence was the sole legal cause of the collision between the Waltham Victory and the carfloat.

7. The Waltham Victory's alleged negligence was not a legal cause of the collision.

8. Pope & Talbot, Inc., is entitled to recover from Reading the damages sustained as a result of the collision.

9. Reading's libel must be dismissed.

10. Pope & Talbot's cross libel against Merritt-Chapman must be dismissed.