**OAKSMITH et al. v. THE MAY-
FLOWER et al.**

**THE MAYFLOWER.**

**GARNER v. OAKSMITH et al.**
No. 3012.

United States District Court,
D. Alaska, First Division. Ketchikan.
Jan. 8, 1951.

Gore & Jernberg, Ketchikan, Alaska, Bogle, Bogle & Gates, Seattle, Wash., for libelants and cross-respondents.

Ziegler, King & Ziegler, Ketchikan, Alaska, Merritt, Summers & Bucey, Seattle, Wash., for respondents, claimants & cross-libelants.

W. C. Stump, Ketchikan, Alaska, for intervenors.

FOLTA, District Judge.

For losses allegedly sustained as a result of collisions between the Kiska and Mayflower, damages are sought in the sum of $36,300 by libelants, as owners and charterers of the Kiska, and in the sum of $17,103 by cross-libelant, the administratrix of the estate of John Garner, owner and operator of the Mayflower at the time of the collisions. Under a stipulation filed before trial, the parties will undertake to settle lien claims which are the subject of numerous libels of intervention, as well as the amount of damages to which the successful party is entitled, leaving to the Court the determination of liability, with the right to submit the question of damages to the Court should the parties be unable to agree.

It appears to be undisputed that shortly before 3:00 A.M. July 24, 1948, on a dark night, but with visibility good, as the Kiska, of 48 gross tons, was proceeding out to sea in an easterly direction through the channel of South Kagaini Harbor, Dall Island, Alaska, U. S. C. & G. S. Chart No. 8146, she collided with the Mayflower, of 17 gross tons, which was then proceeding in the opposite direction into the harbor. The bow of the Kiska struck the port side aft of the Mayflower at an angle of about 45 degrees, cracking the guard rail, several planks and breaking the bulwark. Most of the damage, however, was above the water line. Her momentum carried the Kiska beyond the place of collision. She circled and returned to the starboard side of the Mayflower to inquire if any assistance was needed aboard the Mayflower, but instead of merely approaching the Mayflower, the Kiska again collided with her, causing little visible damage, but puncturing the Mayflower's hull below the water line. However, as a result of the first collision, the iron plate was torn from the stem of the Kiska, from above, to several feet below, the water line and twisted back in such a manner as to leave it in a horizontal position, protruding forward at an angle of about 45 degrees to the line of the keel. As she came alongside of the Mayflower at the time of the second collision, this plate punctured the hull of the Mayflower below the water line on the starboard side causing her to take water so fast that her crew was unable to keep her afloat and she sank in shallow water while being towed to the beach in the harbor, but was subsequently repaired. In the meantime, the Kiska, having sustained damage to her bow of such a serious character as to make it impossible to keep her afloat, was immediately beached, where, being exposed to the open sea, she broke up before temporary repairs could be made and became a total loss.

Upon a review of the testimony, I find it difficult to avoid the conclusion, from the character of the testimony given by Ellis, the master of the Kiska, and his manner of testifying that his testimony was fabricated. He displayed an undue familiarity with the pertinent rules of navigation such as could have been acquired only by much study, for which there was no occasion save that of fitting his testimony thereto. He was unduly positive as to every minute detail of the events leading up to and following the collision and freely commented on the proper interpretation of the rules including the rule justifying departure in the face of unusual circumstances. This, coupled with his subsequent impeachment and the fact that the first collision cannot be logically accounted for on any other hypothesis than this, leads me to the conclusion that his testimony is entitled to little, if any, credence. Three witnesses testified that he admitted responsibility for the first collision within a short time there·

after, saying on one occasion that he was responsible because he had left the pilot house and was not at the wheel at the time of the first collision. This is corroborated to some extent by the witness Ernest Garner's testimony to the effect that it was the invariable practice of Ellis, upon leaving harbors to station himself on the flying bridge and that he was not on the bridge at the time of the collision, nor was he seen in the pilot house and did not appear on the bridge until the approach to the Mayflower to render assistance. Moreover, his testimony that the horn of the Kiska had become inoperative in Kagaini Harbor is contradicted by the testimony of his engineer, Fred Lind, that the horn was inoperative before the Kiska left Seattle for Alaska.

Ellis testified that the situation called for a starboard-to-starboard passage, whereas Ernest Garner, deck hand on the Mayflower, testified that it was one calling for a port-to-port passage. It is obvious that in order to interpose the defense referred to, it was necessary for Ellis to place the Mayflower on the starboard side in order to account for striking her on her port side. Aside from that, if the Mayflower had cut across the bow of the Kiska and the Kiska had immediately put her rudder hard right as Ellis testified, it seems physically impossible that the Kiska could have struck the Mayflower with her stem almost at a right angle. It is far more probable that she would have sideswiped her. Moreover, it is inconceivable that one of John Garner's experience would have executed such a maneuver or that he would not have had the Mayflower, as his son Ernest testified, on the right side of the fairway, as required by the narrow channel rule, and in a position for a port-to-port passage. It should be noted in this connection that John Garner, who was in charge of the navigation of the Mayflower, died before the trial. Indeed, it is impossible to account for the collision except on the hypothesis that Ellis was not at the wheel of the Kiska, for the Mayflower not only had her running lights on but was fully lighted up otherwise.

I find that the Kiska's horn was inoperative and that she was running without lights at the time of the collision. The point made by libelants that testimony on behalf of cross-libelants in regard to the Kiska's lights is negative, is based on a misconception. Testimony that the Kiska was discerned in the darkness, that she was without lights and was barely visible during the time she was under observation immediately preceding and up to the moment of the collision, is positive, not negative testimony. It is true that she was sighted by the Mayflower in time to avoid a collision and in view of the darkness and shadows and consequent difficulty of determining her course and perhaps speed, it was undoubtedly the duty of the Mayflower to give the danger, but not the passing, signal, Art. 18 Rules III and IX; 33 U.S.C.A. § 203. But in view of the conclusion I have reached, that the master of the Kiska was not at the wheel at the time of the collision and that his absence from the pilot house was the proximate cause of the collision, it is immaterial that the Mayflower did not give the danger signal.

In approaching the Mayflower to inquire whether she needed assistance, as required by 33 U.S.C.A. § 367, it was not necessary to pull alongside and it was negligence to do so, particularly where it was done at such a speed as to result in another collision in which the hull of the Mayflower was punctured. But, although liability may be predicated on this ground, I prefer to place it on the ground that the subsequent damage to the Mayflower by ramming was due to the original act of negligence on the part of the master of the Kiska in absenting himself from the pilot house. The peril created as a result of the first collision and the negligent approach to inquire if assistance was needed, were one transaction, The Santa Rita, 9 Cir., 176 F. 890, 30 L.R.A.,N.S., 1210; Southern Railway Co. v. Webb, 116 Ga. 152, 42 S.E. 395, 59 L.R.A. 109. There was thus the requisite continuity between the original negligent act and the effort to avoid its consequences, and the turning

and twisting of the plate from the stem was not such an unnatural or improbable consequence of a collision of the kind here described as to make it unforseeable.

I am of the opinion, therefore, that the cross-respondents are liable for all the damage sustained by the Mayflower.