**OAKSMITH et al. v. GARNER et al.**

No. 13170.

United States Court of Appeals
Ninth Circuit.
May 26, 1953.

Gore & Jernberg and Lester O. Gore,
Ketchikan, Alaska, Bogle, Bogle & Gates
and Thomas L. Morrow, Seattle, Wash.,
for appellant.

Ziegler, King & Ziegler, Ketchikan, Alaska, Summers, Bucey & Howard, Seattle, Wash., for appellee.

Before HEALY and ORR, Circuit Judges, and McCORMICK, District Judge.

## McCORMICK, District Judge.

This is an appeal from an interlocutory decree of fault entered in admiralty by Division Number One of the United States District Court for the Territory of Alaska.

The decision in the court below resulted from libel and cross-libel demands *in rem* and *in personam* and for monetary relief by respective litigants and arose out of collisions involving two machinery-propelled fishing vessels, the Kiska and the Mayflower, which occurred on the 24th day of July, 1948, during darkness, with visibility good for seeing lights, in the channel of South Kaigani Harbor on the easterly side of Dall Island in southeast Alaska.

By stipulation of all parties filed in the District Court the trial therein was limited solely to the question of liability, leaving the question of damages by settlement or adjudication after entry of an interlocutory decree of fault.

Certain nautical deficiencies and faults of the Kiska at the time of the collision and prior thereto are admitted in this appeal, and the question presented here in the light of the record as a whole, is whether the trial court erred in finding that the Kiska was solely at fault. In other words, appellants relying upon the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148, contend that the Mayflower being concurrently at fault with the Kiska in failing to give whistle signals required by Inland Rules for Navigation in Harbors, Title 33 U.S.C.A. § 203, is therefore mutually liable for the collision and that the interlocutory decree should be reversed and the case remanded for entry of a mutual fault decree. We cannot agree with this contention.

■ All the evidence with the exception of the deposition of Fred Lind, engineer on the Kiska at the time of the collision, and that of Ernest M. Garner, a member of the crew and the lookout of the May-flower was by testimony in open court before the trial judge.

And where, as here, both witnesses and depositions are relied upon, the rule enunciated by this court in The Andrea F. Luckenbach, 9 Cir., 78 F.2d 827, is subject to modification in the sound discretion of the Appellate Court, Matson Navigation Co. v. Pope & Talbot, 9 Cir., 149 F.2d 295. We think this latter principle of decision controls the situation shown by the record in this appeal, and viewing such record as a whole, we find no sufficient reason in the exercise of sound discretion to modify the findings of fact or conclusions of law made by the District Court.

On the day in question, after unloading cargo on a fish-buying scow at the head of the bay in South Kaigani Harbor, the Kiska, 59.6 feet in length and 48 gross tonnage, under command of its skipper and operator Jason G. Ellis, with an engineer and deck hand also aboard, proceeded outward bound in an easterly direction slightly north of mid-channel of such harbor, which position and course the Kiska maintained until immediately before the first impact.

The Mayflower, 44.2 feet in length and 17 gross tonnage, in charge of John N. Garner as master, and having also aboard a crew of two and a non-paying passenger, was proceeding inbound westerly in approximately the opposite direction along the right hand side of the channel, destined to berth at another fish-buying scow located at the head of South Kaigani Harbor.

The two vessels collided in the channel inside the harbor. Neither ship blew any whistle signal. There were two impacts, the first occurring when the Kiska's bow headed directly for the Mayflower and the Kiska's stem struck the Mayflower portside aft at an angle of approximately 45°, causing damage mostly, however, above the water line, whereupon the Kiska backed away from the port side of the Mayflower and put about, passing around the stern of the Mayflower, and while the Mayflower without any power was "lying dead" in the water the Kiska proceeded along Mayflower's starboard side to inquire whether assistance was needed and again under engine power

the Kiska struck the Mayflower puncturing her hull below the water line, with resulting serious damage to her to such an extent that she sank in shallow water but was later raised and repaired. We think that this damage flowed proximately from the negligent acts of Captain Ellis in navigating the Kiska both before and after the first impact of the two vessels. Cf. The Santa Rita, 9 Cir., 176 F. 890, 30 L.R.A.,N.S., 1210. The Kiska, having sustained such serious damage to her bow, making it impossible to keep her afloat, was beached, where being exposed to the open sea, she broke up before being repaired and became a total loss.

Not only are there substantial conflicts in the evidence relative to the courses, positions and navigation of the two vessels as they approached each other and when they collided, but except as to the failure of the Mayflower to invoke the whistle requirements of Rule 3 of Navigation for Harbors and Inland Waters, Title 33 U.S.C.A. § 203, the record is devoid of any faulty navigation by the Mayflower other than appears from the oral testimony of the witness Captain Jason G. Ellis of the Kiska. Any light which John N. Garner, the operator and master of the Mayflower at the time of the collision, might have thrown upon the problem before the court was unavailable at the time of the trial as he was then deceased. However, his son, about 24 years of age at the time of the collision and acting as lookout on the Mayflower and who was in the pilot house with his father while the Mayflower was proceeding inwardly in South Kaigani Harbor, through his deposition taken pursuant to stipulation in the presence of attorneys for the respective litigants and received in evidence in the trial court, gave an eye-witness version of the events and circumstances preliminary to and concurrent with the collision which, with the further oral testimony of Harold Cowan, a non-paying passenger aboard the Mayflower, before the trial judge, is in sharp conflict with and materially contradictory to the testimony of Captain Ellis as to the positions and movements of the Kiska and the Mayflower in the early morning of July 24, 1948.

The only other member of the crew of either the Kiska or the Mayflower giving evidence in the court below pertinent to the collisions *per se* was Fred Lind, engineer of the Kiska. He was in the engine room before and when the first impact occurred, and consequently his testimony throws no light on the principal factor in an ascertainment by the court of what the trial judge found to be the proximate, efficient and predominant cause of the collision, namely, the absence of the master of the Kiska from the pilot house and ship controls at the critical periods of her navigation while proceeding outbound along the channel inside of South Kaigani Harbor and to the precise point of the first impact.

Upon this vital and crucial factor in the action as well as the important issue as to whether the Kiska prior to and up to the very point of the first collision had any running lights as she proceeded outwardly in South Kaigani Harbor there was corroborative oral testimony from three witnesses of a substantial impeaching character relative to Captain Ellis's testimony in the premises. Moreover, Captain Ellis was impeached by the evidence of Fred Lind as to the continuity of inoperativeness of the Kiska's whistle for some time before commencing the passage outward from South Kaigani Harbor on July 24, 1948.

The trial judge was in a more advantageous and secure position to evaluate testimony elicited before him from the witness stand in open court than is a court of appeal from an analysis of the cold record before it, and in the light of the factual findings of the court below thoroughly discrediting Captain Ellis' version of the collision in such strong terms as "fabricated and incredible", we are not warranted by any exercise of sound discretion to substitute our independent determination of crucial factual issues which is based upon testimony of witnesses whom we have not heard testify. Cf. Petrich v. Hansen, 9 Cir., 204 F.2d 261.

We have carefully considered and compared all of the evidence in the record before us and without recounting it further in any extended manner or invading a right

of the trier of facts in an admiralty case, we hold that the District Court upon adequate evidence found the Kiska solely at fault for not having aboard a seaworthy and operable whistle, in proceeding and being under way without seaworthy regulation lights which were not turned on until collision was inevitable, in failing to maintain position and course on her own right side of the narrow channel of South Kaigani Harbor and principally because of the absence of the master from the pilot house, leaving the steering wheel and the engine controls unmanned and leaving the heading of the Kiska and the presence of the Mayflower unobserved.

Appellants in their briefs raise a close question of importance and substance as to whether the Mayflower was at fault in failing to give certain signals, namely, a bend signal on approach to the harbor, a passing signal and a danger signal.

■ The closeness of the problem is determinable by ascertaining whether the locale, positions and navigation of the Kiska and Mayflower at relevant times make applicable the International or the Inland Rules of Navigation, 33 U.S.C.A., Chapters 2 and 3, respectively. The District Court was of the opinion that the Inland Rules were applicable and so held during the trial. As in most crucial situations, in the trial of the action the locale of events was controverted by the testimony, but the clear effect of the evidence placed the collision not on the high sea but in the narrow channel inside of South Kaigani Harbor. This designation "South Kaigani Harbor" found and delineated on U. S. Coast and Geodetic Chart 8146 in evidence, which was in effect at the time of the collision, indisputably shows the entrance to this harbor to be from inland waters of the United States, and as such, excluded from the application of the International Rules, 33 U.S.C.A. § 61.

This exclusionary statute is unaffected by Section 302.2 of Regulations promulgated by the Commandant of the Coast Guard, C.F.R. 1947 Supp., p. 5035, because of the clear, definite and certain terms of the preamble and enacting clause of the Act

of June 7, 1897, 30 Stat. 96, 33 U.S.C.A. §§ 151, 154, 231.

■ Under the rule of The Pennsylvania, supra, where a vessel is guilty of a statutory fault the burden rests upon such vessel to show that the fault could not have contributed to the disaster.

■ Rule V provides:

"Whenever a steam vessel is nearing a short bend or curve, in the channel, where, from the height of the banks or other cause, a steam vessel approaching from the opposite direction can not be seen for a distance of half a mile, such steam vessel, when she shall have arrived within half a mile of such curve, or bend, shall give a signal by one long blast of the steam whistle, which signal shall be answered by a similar blast, given by any approaching steam vessel that may be within hearing. Should such signal be so answered by a steam vessel upon the farther side of such bend, then the usual signals for meeting and passing shall immediately be given and answered; but, if the first alarm signal of such vessel be not answered, she is to consider the channel clear and govern herself accordingly. * * *"

Even assuming *arguendo* that the position of the vessels at any time during their respective and relevant movements brought the application of Rule V in operation, the failure of the Mayflower to give the "bend" signal has satisfied the burden enunciated in The Pennsylvania, supra. The testimony of Captain Ellis shows that he had seen the Mayflower in time to avoid the collision if both had kept to their original courses, so that the failure of the Mayflower to give the "bend" signal could not have been a contributing cause. The trial court found that the Kiska was the deviating vessel causing the disaster.

■ The trial judge in the course of his opinion on the case of Oaksmith v. The Mayflower in the District Court, 94 F.Supp. 574 at page 576, stated:

"It is true that she [the Kiska] was sighted by the Mayflower in time to avoid a collision and in view of the

darkness and shadows and consequent difficulty of determining her course and perhaps speed, it was undoubtedly the duty of the Mayflower to give the danger, but not the passing, signal, Art. 18, Rules III and IX, 33 U.S.C.A. § 203."

In preparing findings of fact the proctors for the owners of the Kiska submitted a request for a finding in the words of the above statement of the trial judge in his opinion, upon exceptions thereto by proctors for Mrs. Garner, as Administratrix of the Estate of the Deceased Captain Garner of the Mayflower et al., the trial judge sustained such exceptions and struck from the findings of fact in the court below such statement from the opinion. The formal findings of fact and conclusions of law made by the trial judge and entered in the District Court is the requisite instrument for the consideration of this appeal in this court.

We think the District Court was correct in determining that there was no necessity for the Mayflower to give the passing signal, inasmuch as the court had found that the Kiska was running without lights, and its position could not be determined by a sight of its signal lights, as Rule IX provides:

"The whistle signals provided in the rules under this article, for steam vessels meeting, passing, or overtaking, are never to be used except when steamers are in sight of each other, and the course and position of each can be determined in the daytime by a sight of the vessel itself, or by night by seeing its signal lights. * * *" Cf. The Virginian, 9 Cir., 238 F. 156.

Rule III, being the rule relative to the so-called danger signal, provides:

"If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

It is obvious that the paramount purpose of sounding a danger whistle is to inform and apprise an approaching vessel of the imminence of a collision. In the light of the adequately supported findings of the trial court that the steering wheel and controls of the Kiska were unmanned up to the moment of the first impact, it seems clear in this case that the sounding of a danger signal by the Mayflower could not possibly have avoided the collision and the failure to do such a futile and inherently ineffectual act, considering the time element involved and the negligent obscurity of the Kiska, we think removes the problem from any application of the rule of The Pennsylvania, supra, which would, in the light of the record in this case as a whole, justify a conclusion that the mere failure to sound a danger signal was a contributory cause of the disaster.

From a careful consideration of the record in its entirety, we are of the opinion that the interlocutory decree disposes of the litigated issues before the District Court in accordance with substantial justice and, accordingly, it is ordered that the interlocutory decree of fault be affirmed *in toto.*

It is further ordered that the action be remanded to the District Court solely to award damages in the light of and pursuant to the terms of the stipulation entered in the District Court relative to damages.