**INGRAM CORPORATION et al.,**
**Plaintiffs,**

v.

**The OHIO RIVER COMPANY,**
**Defendant.**

**No. 7722.**

United States District Court,
S. D. Ohio, W. D.
Feb. 16, 1973.

William P. Schroeder, Cincinnati, Ohio, for plaintiffs.

John S. Stith, Cincinnati, Ohio, for defendant.

## OPINION & ORDER

DAVID S. PORTER, District Judge.

This is an admiralty case growing out of a collision on the Ohio River between a gasoline tow and a sunken barge with makeshift markings. There are several questions, one being whether the statutory duty of an owner to mark a wreck as required by 33 U.S.C. § 409 (and the regulation contained in 33 C.F.R. § 64.-01.1; § 64.01–5; § 62.25–1; and § 62.-25–5) can be and is lessened by custom and advice (for want of a better word) from the Coast Guard. Another question is whether notice to the Coast Guard relieves the owner of its statutory duty. Lastly, there are two factual questions, one being whether there was actual or constructive notice of the location of the wreck and its makeshift markings received by the vessel which collided with the wreck. The other is the amount of damages.

These questions were thoroughly briefed after a trial which, for the most part, was by deposition, making this in part a "paper" case, inasmuch as the key witnesses were not present in Court. From the stipulations and the depositions and live testimony the Court makes the following findings of fact in which the parties will be referred to as they are in "shore courts," *i.e.*, plaintiffs and defendant.

## FINDINGS OF FACT

1. On November 3, 1968, a Sunday, the M/V William H. Zimmer was proceeding upstream on the Ohio River with 17 barges in tow. The tow was made up three barges wide, five barges long, with one barge on either side of the Zimmer. The tow reached the vicinity of the Markland Lock and Dam, Mile 533, on the Ohio River, at approximately 2:30 a.m. Another tow, the M/V Memphis Zephyr, was either locking through or waiting to lock through ahead of the Zimmer. The Pilot of the Zimmer, Delmar Gardner, a veteran pilot, while waiting to lock through Markland Dam, maneuvered to put the head of the tow up against a sandbar at the mouth of Log Lick Creek on the Indiana side of the river, to hold the tow until the Zimmer received permission from the lock personnel at Markland Lock to lock through. He misjudged his speed, went too fast, and the lead barges became grounded on the sandbar. The Pilot started backing the tow down to get the lead barges off the sandbar and to straighten out the tow. He knew that in such a maneuver wheel wash coming off the aft rudders created a hazard of sinking the barges lashed to the vessel. He backed as slowly as he could and twisted the boat around. During this operation water came up between the Zimmer and Barge OR 740, into the barge, causing it to sink. The barge which sank was 175 feet long and approximately 30 feet wide.

2. The barge sank (entirely in the channel) at approximately Mile 533.2 of the Ohio River. The channel in that vicinity runs near the Indiana shore and is marked with black buoys on the Indiana side of the river and red buoys on the Kentucky side. Outside the channel the river is nine feet or less deep. The Ohio River in that area bends to the east from a northeasterly direction.

The barge sank near one of the red buoys, approximately 50 to 100 feet below and on the channel side of the buoy. The bow of the barge was 50–100 feet from and below the red buoy and 350–400 yards from the Indiana shore. The sunken barge was covered with approximately seven feet of water. See Drawing No. 1.

[DRAWING NO. 1]

The Captain of the Zimmer knew that vessels having a draft of seven feet or more could not pass over the sunken barge without striking it.

3. The barge was marked by the crew of the Zimmer by placing a blue and white empty oil or grease drum on the upstream end and a white Clorox bottle on the downstream end. These markers were tied to either end of the sunken barge with lines. See Drawing No. 2.

[DRAWING NO. 2]

4. The grease drum was three feet long and 15–18 inches in diameter. A rope was tied around the grease drum several times before the drum was attached to the end of the sunken barge. The end of the drum was also sealed watertight before it was placed in the water. When dropped in the water the drum floated high in the water with the lines around its middle clearly visible.

5. A line was also attached to the handle of the white Clorox bottle with the cap on and screwed tight. The line was then attached to the lower or downriver end of the barge. The top of the Clorox bottle to which the line was attached was underwater when the bottle was placed in the river. The bottom or lower half of the Clorox bottle was visible. Clorox bottles so tied down with

the bottom up float differently from Clorox bottles floating freely. When such bottles float free, they float with the neck up or on their side.

6. Towboats did not at that time, and do not now, customarily carry buoys on board, and these markers were the best available markers. Such markers are commonly used to mark sunken barges, and it was generally known on the river that they are so used.

7. The Master of the Zimmer immediately notified the personnel of the Markland Lock about the sinking of the barge. He asked the lock personnel at Markland Lock to notify the Coast Guard Station in Louisville of the sinking, and the Coast Guard Station was notified early that same morning.

8. The Zimmer, after marking the barge, proceeded around it on the Indiana side of the river and went upstream to lock through Markland Lock at approximately 5:00 a.m.

9. At 9:30 a.m. the same day, the Zimmer docked the remainder of its tow at a rock terminal 18½ miles upstream from the sunken Barge OR 740 and the Captain telephoned the defendant's Port Captain in Wheeling, West Virginia, advising him of the sinking of OR 740, its position, the manner in which it was marked, the position of the Zimmer, and that the Lockmaster had been requested to notify the Coast Guard. He also notified the home office of The Ohio River Company in Cincinnati on the morning of the sinking. The home office of the defendant, The Ohio River Company, is located in Cincinnati, Ohio, approximately 50 miles from the sunken barge.

10. At the time of such notification to the defendant's Port Captain, the capabilities of the Zimmer in reference to the location of the wreck and the location of the home office of the owner were such that the Zimmer could have proceeded to the Defendant's home office at Cincinnati and returned to the location of the wreck with or without its tow prior to the time the sunken barge

was hit by the plaintiff, Ingram Corporation's barge Illinois in tow of its motor vessel Nelson M. Broadfoot.

11. Highways on land were open and in use between the home office of the defendant in Cincinnati and the location of its sunken barge OR 740 on the Ohio River, and the driving time from the defendant's home office to the location where the barge sank was 1½ to 2 hours. However, there was no evidence that The Ohio River Company stored any marker buoys or other suitable means of marking wrecks at its home office.

12. At 9:30 a.m. on November 3, 1968, when defendant's Port Captain received information of the sunken barge OR 740, he issued no change in orders for the Zimmer and tow which were to proceed up river away from the location of the wreck.

13. On the morning of November 3, 1968, the defendant received a telegram from the District Commander of the Second Coast Guard District in St. Louis, Missouri, notifying it of the sunken barge and the defendant's legal duty to mark the barge with a buoy or day mark, and stating that if the defendant could not mark the barge as required the Coast Guard would commence marking at the Company's expense.

14. The Ohio River Company's Port Captain in Huntington, West Virginia, sent a telegram to the Commander of the Second Coast Guard District in St. Louis at 2:00 p.m. on November 3, 1968, advising of the sinking of the barge and requesting the Coast Guard to mark the sunken barge with a lighted buoy as soon as possible.

15. The Coast Guard prepared notices to mariners for broadcast over marine radio stations with transmitters at Granite City, Illinois, and Irwin, Pennsylvania.

16. The notice to mariners concerning the sunken barge was No. 571. We find that in all probability it was broadcast that day and the next day over the radio station at St. Louis to which the plaintiff listened. There is no doubt

that it was broadcast that day and the next at the radio station in Irwin, Pennsylvania, and by the Coast Guard's own radio station in St. Louis.

17. The defendant was not able to establish that the notice to mariners, *i.e.*, safety broadcast, advising of the existence and location of the sunken barge OR 740 was received aboard the Broadfoot. Such radio communications are far from sure-fire, since they are adversely affected by null (a freak occurrence which happens when the vessel is located where different radio waves come together). Radio communications are also adversely affected by conditions of the ionosphere, jamming, weather, and topography.

18. Lockmasters at McAlpine and Markland Dams were notified of the sunken barge and its position. They were instructed to instruct all traffic of the hazard.

19. Approximately 10 tows passed the sunken barge during the morning, afternoon and evening of November 3, 1968, and on the morning of November 4, 1968, and did so without incident. The lock personnel at both Markland and McAlpine apparently complied with instructions and advised all passing tows of the location of the sunken barge.

20. One of the tows passing the sunken barge was M/V L. Fiore, owned by The Ohio River Company. The Master of that vessel, Captain Howard Garland, was notified at McAlpine Lock on the evening of November 3, 1968 and also by a passing tow of the sunken barge and its location, and he called Markland Lock about five miles below the lock to obtain more information about its location and markings. Captain Garland easily identified the markers and had no trouble passing the sunken barge on the Indiana side at about 7:00 or 7:30 a.m. on the morning of November 4, 1968.

21. On November 4, 1968, the M/V Nelson M. Broadfoot was proceeding upstream from Louisville with four chemical barges in tow. Two barges had been dropped off below Louisville and the remaining two proceeded through McAlpine Lock at Louisville at approximately 4:30 a.m. November 4, 1968. The Pilot on duty was Walter Cannon, a "trip pilot" and not a regular employee of the vessel of The Ingram Corporation. Whether he received actual notice when he locked through at McAlpine is a question which is much disputed and will be considered next.

22. Because of its importance and difficulty, this question merited and received special attention. After such analysis of the testimony pro and con, the Court concludes that the defendant did not meet its burden of proving that the Broadfoot had actual notice of the wreck by oral communication at McAlpine any more than it did by radio.

23. The lock man, Mr. McCarty, had difficulty contacting the Broadfoot but finally made connections and said whoever answered (unidentified) said: "Roger" or "I got you o. k." after being warned about the wreck *and* advised to come in to the lock. Stacked against this is the testimony to the contrary by the Captain, Mate and Pilot of the Broadfoot, Messrs. Brooks, Huie, and Cannon. They denied the receipt of such notice. Cannon was the trip pilot who was on watch. Huie was out on the tow.

24. We have not overlooked defendant's point that McCarty was in a sense "independent" and gave a consistent statement to an attorney from the Corps of Engineers shortly after the wreck. While McCarty was not a live witness, and we therefore did not have the benefit of personal observation in assessing his credibility, a close reading of the deposition shows it is anything but smooth-flowing and gives the impression that the witness was having difficulty being certain about things. This reflected on the credibility of the deposition. In addition, the warning was double-barreled and, if given, the acknowledgement "Roger," or "I got you o. k." might well have been directed to

the advice to lock through and not meant as an acknowledgement of anything else. Since the testimony was by deposition the trial court's finding may therefore be reviewed without the limitation that it only be upset if "clearly erroneous." But that does not lessen the responsibility of the trial court in deciding whether to believe the three or the one, nor does it make it any easier to determine this crucial issue.

25. All things considered, the Court concludes that the decision turns on whether the defendant met its burden, and we conclude it did not do so.

26. Walter Cannon went off watch after locking through McAlpine Lock at 6:00 a. m. the morning of November 4, 1968, and the Captain, Saunders Brooks, went on watch.

27. Approximately five minutes prior to striking defendant's sunken barge, the Master of the Broadfoot contacted Markland Lock and Dam and received instructions to proceed up to the lock but was not notified of the existence or location of defendant's sunken barge OR 740.

28. The Broadfoot approached Markland Lock and Dam immediately before noon on November 4, 1968. The weather was clear, and the tow was proceeding at about nine miles per hour. The two barges in the tow had a draft of nine feet. There was a river current of one mile an hour or less. Captain Brooks sighted the Clorox bottle and the drum marking the sunken barge when the tow was approximately one mile from the markers. He looked at these objects through his binoculars, knowing that oil and grease drums are often used to mark sunken vessels or objects. After studying the objects he concluded they were debris adrift in the river.

29. As the Broadfoot was passing between the markers and the red buoy on the Kentucky side of the sunken barge, at its full-ahead speed of nine miles per hour, the lead barge in the tow, the Barge Illinois, struck the starboard stern of OR 740 and became grounded on it, thus damaging both the Barge Illinois and the sunken barge OR 740 and causing release of part of the Illinois' cargo of gasoline into the river (see Drawing No. 2). The collision occurred within the navigable channel of the Ohio River, 33 hours after the sinking of defendant's barge OR 740.

## CONCLUSIONS OF LAW

### DISCUSSION

Any discussion of the law must begin with the pertinent statute, the Wreck Act, 33 U.S.C. § 409 and the Regulations, 33 C.F.R. § 64.01–1; 64.01–5; 62.25–1; 62.25–5.

The pertinent part of 33 U.S.C. § 409 is as follows:

". . . And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; . . . ."

The pertinent sections of 33 C.F.R. are:

§ 64.01–1 General.

(a) The owner of a vessel sunk in the navigable waters of the United States who fails to mark the wreck immediately for the protection of navigation with a buoy or daymark during the day and a light at night may, in addition to being in violation of 33 U.S.C. 409, be liable for resulting damage to the public. The owner of a sunken obstruction other than a vessel which creates an obstruction to the navigable capacity of any of the waters of the United States may, in addition to being in violation of 33 U.S. C. 403, be liable for resulting damage to the public.

(b) The Coast Guard is authorized to mark for the protection of naviga-

tion any sunken vessel or other obstruction that is not suitably marked. Marking by the Coast Guard does not relieve the owner of any such obstruction from the duty and responsibility suitably, to mark the obstruction and remove it as required by law.

§ 64.01–5 Marking by owners.

Buoys, daymarks, and lights established by owners of sunken vessels or other obstructions to mark such obstructions for the protection of navigation shall conform to the lateral system of buoyage prescribed by Subpart 62.25 of this chapter. Such markings shall be maintained until the obstruction is removed or the right of the owner to abandon is legally established and has been exercised.

§ 62.25–5 Colors.

When proceeding from seaward:

(a) Black buoys mark the port (left) sides of channels, or the location of wrecks or obstructions which must be passed by keeping the buoy on the port (left) hand

(b) Red buoys mark the starboard (right) sides of channels, or the location of wrecks or obstructions which must be passed by keeping the buoy on the starboard (right) hand.

(c) Red and black horizontally banded buoys mark junctions or bifurcations in the channel, or wrecks or obstructions which may be passed on either side. If the topmost band is black, the preferred channel will be followed by keeping the buoy on the port (left) hand. If the topmost band is red, the preferred channel will be followed by keeping the buoy on the starboard (right) hand.

Note: When proceeding toward seaward, it may not be possible to pass on either side of these buoys, and the chart should always be consulted.

(d) Black and white vertically striped buoys mark the fairway or midchannel.

One contested issue of law is whether the owner was relieved of liability because it notified the Coast Guard of the wreck. The owner relied on Petition of Anthony O'Boyle, Inc., 161 F.2d 966 (2 Cir., 1947), one of the line of cases beginning with The Plymouth, 225 F. 483 (2 Cir., 1915), and containing Red Star Towing and Transportation Co. v. Woodburn, 18 F.2d 77, 79 (2 Cir., 1927) where the Court said:

". . . . Not only did he do nothing, but he directed the department to do nothing, though, had he told them to proceed, he would have been absolved. The Plymouth, 225 F. 483 (C.C.A. 2)."

See also, New York Marine Co. v. Mulligan, 81 F.2d 532 (2 Cir., 1929) and The Farragut, 71 F.Supp. 72 (S.D.N.Y., 1946), aff'd June 3, 1947, 161 F.2d 966 (2 Cir.).

But the Second Circuit recognized a need for discounting this line of cases in Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2 Cir., 1951). There the Court stated:

"Nor do the unsuccessful efforts of the Coast Guard to locate and mark the wreck affect this liability. It has long been the law that an owner may comply with the statutory requirement for marking by getting the Lighthouse Department (now the Coast Guard) to do it; when the Coast Guard does mark the wreck, whether properly or not, the owner is relieved of any statutory duty in that respect. The Plymouth, 2 Cir., 225 F. 483, certiorari denied, 241 U.S. 675 [36 S.Ct. 725, 60 L.Ed. 1232]; New York Marine Co. v. Mulligan, 2 Cir., 31 F.2d 532; City of Taunton-Sunken Wreck, D.C.S.D.N.Y., 11 F.2d 285, 1927 A.M.C. 135; The Barge Chambers, D.C.S. D.N.Y., 98 F. 194, 1924 A.M.C. 572; Wilson v. Mitsui & Co., D.C.N.D.Cal., 27 F.2d 185. The basis of this exception to the otherwise non-delegable duty is the fact that the private owner cannot interfere with the manner in which the government agency uses its discretion in the manner of marking. The Plymouth, supra. Although the

**490**

Coast Guard's search for the wreck may, if made with due diligence in the light of the facts within the knowledge of the owner, operate to discharge the owner's duty, the mere fact that the Coast Guard undertakes a search does not relieve the owner of liability for failure to make all reasonable efforts to mark. The Snug Harbor, 4 Cir., 40 F.2d 27. The dicta in Petition of Anthony O'Boyle, Inc., 2 Cir., 161 F.2d 966, 967, and Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77, 79, which may indicate the contrary should be discounted accordingly. Nor is it of any moment that the appellant's liability to mark ceased when the Coast Guard finally did mark the wreck, for by then all the damage had occurred. It follows that the barge owner was correctly held guilty of violating the wreck statute and liable for the damages caused the vessels which hit the wreck before it was marked." 187 F.2d 665, 669.

In The Snug Harbor, 40 F.2d 27, at 30 (4 Cir.) the Court noted with approval, the following, which was said by the Judge below:

" ' . . . . I have examined these cases [including The Plymouth, 225 F. 483 (2 Cir., 1915)] carefully, and I do not think they go the extent claimed. They do hold that, when the wreck is found, and the Lighthouse Service, either voluntarily or at the request of the owner, buoys and lights the wreck, the owner may not thereafter be held for damage caused by the faulty way in which the work is done. This is so because, when they act with respect to marking a wreck, they act officially, and because the owner, though he may believe a better and safer way should be adopted, is not authorized for that reason to challenge or change what they have done. But there is no obligation on the Service to find a wreck. On the contrary, this duty is imposed on the owner, and though the Service may extend its facilities to the owner to aid in finding the wreck in

the interest of safe navigation, such action on its part does not pre-empt the field or excuse the owner from the personal performance of a duty imposed by law. I am constrained to hold, therefore, that, notwithstanding the efforts of the Lighthouse Service to find the wreck, the continuing obligation of the owner, either formally to abandon or to use due diligence to find, continued unabated . . . . ' "

Along the same line, we note with approval, the following from Reading Company v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D.Pa., 1961), at 666:

"We conclude, therefore, that Reading's failure to mark the wrecked carfloat was a violation of the statute, and that, under the evidence, the fault lies solely with Reading. The general rule, and the authorities therefor, are clearly stated in Lowery v. The Ellen S. Bouchard, D.C.N.D.N.Y.1955, 128 F.Supp. 16, 23:

" 'A strong and consistent line of authority has placed the duty to mark upon the owner of the sunken wreck alone. The Anna M. Fahy, 2 Cir., 153 F. 866; The R. J. Moran, 2 Cir., 299 F. 500, 502; Red Star Towing & Transportation Co. v. Woodburn, 2 Cir., 18 F.2d 77; Berwind-White Coal Mining Co. v. Pitney, 2 Cir., 187 F.2d 665. The general principle of statutory responsibility is maintained throughout the decisions.

" 'In the Moran case, citing the Fahy case, it is reiterated (299 F. 503): "This court has held that duty is upon the owner and no one else, and that there is no divided responsibility; the reason being that, if the statute is to be effectual, there cannot be." ' "

And the following in Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., 312 F.2d 78 (2 Cir., 1962) (Waterman, J.):

". . . . Furthermore, even it it were established that Tracy had requested the Coast Guard to patrol or mark the sunken barge, such a request

would not discharge Tracy's non-delegable, statutory duty to mark the wreck. Berwind-White Coal Mining Co. v. Pitney, 187 F.2d 665 (2 Cir., 1951)." 312 F.2d 78, at 83.

■ The fact that no notice was taken in defendant's brief of the "discounting" of The Plymouth, *supra*, and its progeny prompted a request by the Court for supplemental briefs on the precise question. Study of these, the main briefs, and the cases compels the conclusion that notice to the Coast Guard did not relieve The Ohio River Company of liability in this case.

■ It must be recalled that the Coast Guard was in St. Louis and the vessel Lantana which was dispatched November 3, 1968, to mark the barge with lighted buoys had hundreds of miles to go to the scene of the wreck. Hence, on reason, as well as authority, it would make no sense to conclude that notification of the Coast Guard relieved the owner of liability. On the contrary, it remained the owner's statutory non-delegable duty to mark the wreck as required by the Wreck Act, and to do so as soon as possible. Such rule is to be viewed in the context of the use of the River in the transportation of flammable and explosive materials in large amounts, and, for that matter, for other chemicals.

The Anna M. Fahy, *supra*, should be noted briefly. There the owner of a canal boat which was sunk in New York Bay, who received notice of the sinking at once and could have had it marked as required by statute within an hour, was held liable for damages caused by a passing vessel coming into collision with the wreck six hours later, when it was still unmarked. The Court said the word "immediately" undoubtedly:

". . . should be construed having in view the circumstances of the particular situation in hand; what might be justifiable delay in one case would be culpable delay in another." 153 F. 866, at 867.

It is noteworthy for that reason and also because the Court said:

*"The statute places the duty to mark upon the owner and no one else; there is no divided responsibility and, if the statute is to be effectual, there cannot be."* 153 F. 866, at 868. (Emphasis added.)

In connection with this conclusion that the duty imposed on the owner to mark a wreck with a buoy or beacon cannot be delegated, see also Elizabeth Co., Inc. v. Mesick & Mesick, Inc., 298 F. 743 (2 Cir., 1924).

■ A drastic and unusual presumption arises on it being shown that a vessel has been guilty of statutory fault before a collision. Gilmore & Black, The Law of Admiralty, p. 404, citing The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), from which the so-called "Pennsylvania Rule" derives its name:

"Where this [statutory fault] appears, the vessel thus cast in fault must prove, to escape liability, not only that the fault shown probably did not but also that it *could not* have contributed to causing the collision." (Emphasis in original.) Gilmore & Black, supra, at 404–405, citing 86 U.S., at 136, and noting in footnote 49: "This rule has been followed in countless cases (citations omitted)."

And see also Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., *supra*, where, at p. 83 of 312 F.2d, the Court said:

". . . . The language of the Supreme Court in The City of New York, 147 U.S. 72, 85 [13 S.Ct. 211, 216, 37 L.Ed. 84], is also pertinent:

'Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the

propriety of the conduct of such other vessel should be resolved in its favor.'

And see Reading Company v. Pope & Talbot, Inc., 192 F.Supp. 663 (E.D. Pa.); aff'd 295 F.2d 40 (3 Cir., 1961)."

■ The defendant points out that it was customary on the River to mark wrecks as they did with oil drums and Clorox bottles, and this was acknowledged on cross-examination by the Master of the Broadfoot. The defendant also brought out through experts that on the subject of marking wrecks in the Coast Guard's "Light List," the text is followed by a statement:

". . . . *Provided,* that until the owner has the opportunity to establish such standard markings, *he shall maintain the most suitable markings available under the circumstances which will warn the navigator of the sunken wreck."* (Emphasis in original.) Coast Guard Light List, Volume V, Mississippi River System (1970) p. VII.

In its brief the defendant refers to this statement as a "regulation." Defendant contends the Light List was issued pursuant to § 2, Title 14 U.S.C., which sets out the primary duties of the Coast Guard as follows:

"The Coast Guard shall enforce or assist in the enforcement of all applicable Federal laws upon the high seas and waters subject to the jurisdiction of the United States; shall administer laws and promulgate and enforce regulations for the promotion of safety of life and property on the high seas and on waters subject to the jurisdiction of the United States covering all matters not specifically delegated by law to some other executive department; shall develop, establish, maintain, and operate, with due regard to the requirements of national defense, aids to maritime navigation, icebreaking facilities, and rescue facilities for the promotion of safety on and over the high seas and waters subject to the jurisdiction of the United States; and shall maintain a state of readiness to function as a specialized service in the Navy in time of war. Aug. 4, 1949, c. 393, § 1, 63 Stat. 496."

We conclude that examples of "regulations" the Coast Guard can promulgate are §§ 64.01–1, 64.01–5 and 62.25–5, 33 C.F.R., set out herein at pages 12 and 13. The Light List appears to the Court to have been printed under the authority to establish aids to navigation. Hence we conclude the above statement is not a "regulation."

Defendants argue that the statement in the Light List "discounts" the regulation. We disagree and conclude that the positive requirement about marking wrecks contained in the regulations and the statute (33 U.S.C. § 409) cannot be discounted by advice about the marking of wrecks contained in a publication describing aids to navigation established by the Coast Guard pursuant to Title 14 U.S.C. § 2.

■ The Court agrees with the plaintiffs that neither the unofficial statement in the Coast Guard's Light List nor custom can have the effect of making the owner's duty to mark a wreck any less than what the statute says it is. In this connection see Morania Barge No. 140, Inc. v. M. & J. Tracy, Inc., supra; Prosser, Law of Torts (4th Ed.) p. 190–191. See also Gilmore & Black, Law of Admiralty (1955 Ed.) § 7–13, p. 424, and cases cited in plaintiff's supplemental memorandum on specific points of law, at pp. 5–6.

■ As noted at the outset, one of the factual questions in this case is whether the Broadfoot had actual or constructive notice of the location and marking of the wreck. This is true because:

"If a collision is attributable to the fault of one of the vessels only, that vessel must bear its own loss, and pay for the other's damages as well." Gilmore & Black, supra, at 402, citing The Clara, 102 U.S. 200, 26 L.Ed. 145

(1880); Oaksmith v. The Mayflower, 94 F.Supp. 574, 13 Alaska 157 (1951), aff'd sub nom. Oaksmith v. Garner, 205 F.2d 262, 14 Alaska 309 (1953).

"Where the fault of both vessels causes the collision, the damages are divided—that is to say, such a decree is entered as shall have the effect that each bears half the total damage." Gilmore & Black, supra, p. 402, citing The Catharine v. Dickinson, 58 U.S. (17 How.) 170, 177–178, 15 L.Ed. 233 (1855).

"In effect this involves a payment by the less injured to the more injured vessel." Id.

"American law makes no provision for dividing fault—or damages—on a sliding scale of percentages. A vessel is either at fault or not at fault, and the effect of fault is never graded. . . ." Id.

Gilmore & Black point out that there is a "major-minor fault" rule, the operation of which sometimes mitigates the harshness of a doctrine which would divide damages equally in the case where one vessel is grossly negligent while the other is at fault, if at all, only in a technical sense. But discussion of this is not considered necessary because the Court did not follow that rule inasmuch as it is characterized as "vague and unreliable" by the authors. Id., p. 403. We could find no Sixth Circuit case requiring that we do so.

 It is obvious that under these rules The Ohio River Company cannot escape liability. It was not only negligent in running aground and sinking Barge OR 740, but it also breached a statutory norm and a "statutory" fault invokes the "Pennsylvania" rule. Gilmore & Black, supra, p. 407. Thus, proof of a causal connection between such fault and the accident is not necessary, as it is in the case of a ship at fault in some other regard. Id., p. 407. However, if the plaintiff was negligent, e. g., in failing to heed a warning, and there is a causal connection between such negligence and the accident, the divided damages rule would apply.

 Also, this is an affirmative matter and therefore the defendant has the burden of proving by a preponderance of the evidence that the plaintiff had actual or constructive notice of location and marking of the wreck.

 Finally, in connection with the presence of oil drums and such things as Clorox bottles in the river, it should be noted that a Master has the right to assume that the waterway is clear of wrecks or that markers are present as required by law. Jones Towing, Inc. v. United States, 277 F.Supp. 839 (E.D. La., 1967); Morania Barge No. 140 v. M. & J. Tracy, Inc., supra.

SUMMARY

1. The Court has jurisdiction and venue of the parties and of the subject matter. 46 U.S.C. §§ 183–189.

2. The Ohio River Company's Barge O.R. 740 was a wreck and sunk in a navigable channel within the meaning of the Wreck Act, 33 U.S.C. § 409.

3. It was the duty of The Ohio River Company, as owner of the wrecked barge, to mark it as required by the provisions of the Wreck Act (33 U.S.C. § 409) and pertinent regulations.

4. The Ohio River Company was negligent in failing to mark its wrecked barge.

5. It was also negligent in running the tow too hard into the sandbar at the mouth of Log Lick Creek and was negligent in sinking Barge O.R. 740 from wash generated in the backing off the sandbar and directed by the flanking rudder toward the barge.

6. The Ohio River Company's negligence was the sole legal cause of the collision between the Barge O.R. 740 and Barge Illinois.

 7. The Ingram Corporation's alleged negligence was not a legal cause of the collision.

8. Ingram Corporation and the insurance companies subrogated to part of its claim and Texaco, Inc., are entitled to recover from The Ohio River Company the damages sustained as a result of the collision.

9. The Ohio River Company's libel must be dismissed.

## DAMAGES

There is no dispute that, as claimed by plaintiffs, damages for loss of use of a vessel are recoverable in an action arising out of the collision of that vessel with another. The Gylfe v. The Trujillo, 209 F.2d 386 (2 Cir., 1954); Agwilines, Inc. v. Eagle Oil & Shipping Co., 153 F.2d 869 (2 Cir., 1946). Also, it needs to be noted that the Barge Illinois was a part of a matched set of four barges, together with the Broadfoot, and all were under contract with Texaco Corporation for hauling Texaco fuel from Mount Vernon, Indiana, to Louisville, Kentucky, and Cincinnati, Ohio. The Barge Illinois was manufactured in June, 1968, especially for this trip and was placed in service August, 1968, just three months prior to the collision.

The revenue derived from shipments of gasoline by Barge Illinois was on the basis of $1.00 per net short ton. The uncontroverted testimony was that the barges had only been in service for three months, so that basis was taken for the purpose of striking an average.

It was also uncontroverted that during the down-time of the Illinois, the Broadfoot made three trips from Mount Vernon to Cincinnati without the Illinois, and that all expenses, salaries, overhead, insurance, fuel, and others remained the same. Also, for one trip a substitute barge was chartered, which reduced the loss for that trip.

As to damage, the parties have stipulated that as a result of physical damage to Barge O.R. 740, The Ohio River Company was damaged in the amount of $9500; that Texaco was damaged in the amount of $7145.01 from loss of product resulting from the collision; and the

parties have also stipulated that Ingram Corporation was damaged—suffered physical damage to Barge Illinois in the amount of $36,178.87. See stipulation filed December 26, 1972 (document 38).

Hence, the only disputed item of damage is the plaintiffs' claims for loss of use for three trips, the cost of returning the Illinois to tow, and the loss from the entire tow experiencing three and a half days down-time at the wreck.

As to the plaintiffs' claim for loss of use of the Barge Illinois on the three trips dated November 13, 20, and 26, 1968, no discussion is necessary, because the plaintiff appears willing to accept the lowest reasonable alternative of the defendant in calculating such loss of use, so the Court goes along with that. This is in the sum of $8,052.

As to the cost of returning the Barge Illinois to tow, plaintiff claims the actual cost in the amount of $2066, consisting of $1000 as the cost of O. H. Ingram for one-third of a day and the cost of M/V Nelson M. Broadfoot for two-thirds of a day in the amount of $1066.

Mr. Slicho testified that ordinarily it would only cost $250 for another tow to pick up Illinois and return it to tow, but none was available. Despite the spread between the two figures we must conclude that the plaintiff did mitigate its damages, because they returned Illinois to tow as soon as possible, and thereby avoided another item of loss, namely, loss of profit for another trip in the amount of $3122.58. Hence, the Court allows plaintiffs' claim for the cost of returning the Barge Illinois to tow in the amount of $2066.

The loss from the entire tow experiencing three and a half days down-time at the wreck is also disputed. Plaintiffs' method of calculating its damage is to take half of the average profit from the entire tow during four preceding seven-day trips. The average profit from each trip was $10,678 and half of that is $5339. The defendant maintains there would have been lock and loading delays anyhow, so this claim

should not be allowed. That overlooks the fact that but for the down-time at the wreck plaintiff could have taken half a trip. Defendant says this amounts to double recovery. We fail to see how it does, so the plaintiffs' claim for loss because the entire tow was out of circulation three and a half days down-time at the wreck is assessed at $5339.

Thus, damages are assessed in favor of the plaintiff Ingram Corporation and the insurance companies to which it is subrogated and against The Ohio River Company in the amount of $51,635.87, and in favor of Texaco, Inc., and against The Ohio River Company in the amount of $7,145.01, and no damage can be allowed for defendant's claim for damage to Barge O.R. 740.

It is so ordered.